IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHARLES SHEPPARD,

                Plaintiff,                  OPINION AND ORDER

v.

                                    19-cv-724-wmc

LYNN BLISS, JAIME ADAMS and
HOLLY GUNDERSON,

                Defendants.

In 2019, *pro se* plaintiff Charles Sheppard was incarcerated at the Wisconsin Secure Program Facility ("WSPF"). Sheppard contends in this lawsuit that three Wisconsin Department of Corrections ("DOC") employees working at WSPF violated his rights under the Eighth Amendment of the Constitution in May of 2019 by (1) denying him access to a wheelchair for use in his cell and (2) failing to provide him an adequate chair. Sheppard claims that both actions lead to a fall that required emergency medical attention. Now before the court is defendants' motion for summary judgment. (Dkt. #33.) Because no reasonable jury could conclude that any of the three defendants consciously disregarded Sheppard's need for an adequate chair in his cell, defendants are entitled to summary judgment on the merits of Sheppard's Eighth Amendment claims. Accordingly, the court will grant defendants' motion and direct entry of judgment in defendants' favor.

UNDISPUTED FACTS[1]

Plaintiff Charles Sheppard was incarcerated at WSPF in February 2019. At that time, the three defendants worked in different capacities at WSPF: Jaime Adams was the

---

[1] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn

Health Services Manager ("HSM"); Holly Gunderson was a DOC Health Services Nursing Coordinator who worked at WSPF starting in March 2019 to train Adams; and Lynn Bliss was a correctional officer.

Sheppard weighed over 400 pounds in February of 2019, and he did not fit into the plastic chairs prisoners typically use in their cells at WSPF. On February 10, 2019, Sheppard submitted a Health Services Request ("HSR"), in which he complained about falling in his cell after his chair broke. A few days later, while non-defendant, Dr. Eileen Gavin, was meeting with Sheppard about another health issue, he requested what Dr. Gavin described as a "bariatric chair," which is wider than a standard chair and capable of supporting more weight. Sheppard also asked for a formal modification to his medical restrictions, so that he could use a regular wheelchair in his cell until his new chair arrived. Dr. Gavin agreed to change his restriction, allowing Sheppard to use a wheelchair in his room until a bariatric chair arrived, provided security deemed that use appropriate. Similarly, Dr. Gavin noted that security would need to approve the bariatric chair.

Defendant Bliss was working as a CO in Sheppard's housing unit at that time. On April 29, Bliss called the HSU to ask whether Sheppard needed his wheelchair, after Sheppard was seen walking to recreation and meals without his wheelchair. At the time of his inquiry, Bliss attests that he did not know that Sheppard had a restriction to use his wheelchair as a chair in his cell only. Rather, Bliss assumed that Sheppard needed the wheelchair to move around the prison; thus, he was curious whether the restriction was

---

these facts from the parties' proposed findings of fact and responses, as well as the underlying, record evidence as appropriate.

even necessary after seeing Sheppard moving around without apparent distress. Further, Bliss attests that he neither told Sheppard that he did not need his wheelchair, nor did he discontinue access to that device, because he had no authority to make either of those determinations. In fairness, however, Bliss does not remember whether he ever spoke with Sheppard about his using the wheelchair in his cell.

In contrast, Sheppard contends that Bliss knew about the restriction and the problems he had previously with chairs in his cell. He also claims that Bliss was already angry at Sheppard about a separate dispute they had a few days earlier. According to Sheppard, Bliss then came to his cell and told Sheppard that he was faking his need for a wheelchair. In fact, Sheppard maintains he was the one who informed Bliss that he was restricted to use his wheelchair only as a chair in his cell, because the plastic chairs in his cell kept breaking.

Regardless, there is no dispute that Bliss made a call to HSU, which prompted defendant HSM Adams to reach out to Dr. Gavin about whether Sheppard needed the wheelchair. Dr. Gavin responded that she was not the one who ordered his use of the wheelchair in the unit, and that she believed he only had it for hip pain or possible surgery. Indeed, Dr. Gavin then stated, mistakenly as it turned out, that if Sheppard was able to walk to recreation and meals, then she did not know why he would need the wheelchair.[2]

---

[2] Although Sheppard takes issue with the fact that Dr. Gavin gave an opinion based on Adams' report, no evidence indicates that Adams relayed incorrect information. Sheppard also objects to this proposed finding of fact under the best evidence rule because defendants merely rely on Gunderson's declaration. However, defendants' citation is to Sheppard's contemporaneous medical records, which documented Dr. Gavin's response at the time (*see* Ex. 1002 (dkt. #37-1) at 5-6), and Gunderson further attested after reviewing his records, that he had confidence in their accuracy. Therefore, these objections are overruled.

On May 24, HSM Adams and Nurse Coordinator Gunderson met with Sheppard in the HSU. Sheppard arrived pushing his wheelchair. While Sheppard does not dispute pushing his wheelchair that day, he denies using his wheelchair as a walker. Rather, Sheppard explained that he brought the wheelchair because Gunderson had directed him to bring it to the appointment. During the meeting, they discussed Sheppard's shoe restrictions, as well as his use of the wheelchair. Specifically, the notes from that meeting refer to a discussion about Sheppard being seen pushing his wheelchair like a walker, instead of sitting in it, and Gunderson and Adams explaining that it was dangerous to do so because the wheelchair did not have brakes. The notes also refer to a discussion of Sheppard using an oversized walker, but giving up the wheelchair in his cell becuase he would not be able to move around his cell safely with both present. According to Gunderson, Sheppard then agreed to getting a walker with a seat to replace the wheelchair.

Sheppard describes his discussion with Adams and Gunderson quite differently, attesting that he never agreed to trade his wheelchair for a walker with a seat, because he already had a walker in his unit. Sheppard also attests to having "vehemently argued" with Gunderson and Adams about keeping his wheelchair, telling them that the plastic chairs in his cell could not hold his weight and that he had broken plastic chairs on three occasions, which was why Dr. Gavin had given the restriction to use the wheelchair in his cell. (*See* Sheppard Decl. (dkt. #53) ¶¶ 7, 8.) Sheppard further maintains that Gunderson and Anderson responded that they "did not care about Dr. Gavin's order," and that they had decided to take the wheelchair restriction away. (*Id.* ¶ 8.)

4

Adams and Gunderson then consulted with another non-defendant, Nurse Practitioner McArdle, who ordered that the wheelchair restriction be discontinued and Sheppard instead be provided with a wheeled walker. As a result, Sheppard received a wheeled walker with a seat and left the HSU without his wheelchair. Sheppard claims that he left the wheelchair only because Adams and Gunderson threatened him with disciplinary action if he did not.

Finally, Adams and Gunderson recall Sheppard asking about a chair for his cell. Gunderson called the warehouse and was told that they had a chair that could hold up to 700 pounds. Gunderson's understanding from that phone call was that Sheppard would receive that chair, believing it would be was appropriate for his weight.

At that point, Sheppard went back to his cell, but did not receive a new chair. Sheppard also says that over the next few days he wrote to the HSU checking on the status of his bariatric chair, although defendants' have no record of an HSR from Sheppard on that topic during that time. On May 30, 2019, Sheppard sat in a plastic chair that was present in his cell, and he fell when the chair broke. Sheppard was sent to the emergency room, and was then seen by several HSU staff members, having suffered a concussion. CO Bliss does not remember whether he provided Sheppard a new plastic chair before his fall.

OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). If there is any genuine issue as to any material fact, the court cannot grant summary judgment. *Id*. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Finally, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255.

I. **Eighth Amendment**

The Eighth Amendment recognizes a prisoner's right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97 (1976). To prevail on a claim of constitutionally inadequate medical care, an inmate must demonstrate two elements: (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent. *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). First, a medical need is "serious" if it: so obviously requires treatment that even a lay person could recognize the need for medical attention; carries risk of permanent serious impairment if left untreated; results in needless pain and suffering; *or* significantly affects an individual's daily activities. *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997). Second, "deliberate indifference" is a high standard; it means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it. *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Thus, acts of deliberate indifference requires *more than* negligence, or even gross negligence, but something less than *purposeful* acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Defendants seeks summary judgment

6

on the ground that the evidence does not support a reasonable jury inferring they acted in conscious disregard of Sheppard's need for a specific type of chair in his cell. Based on the undisputed evidence of record, the court agrees.

### A. Bliss

Bliss seeks summary judgment because he did not consciously disregard Sheppard's need for a wheelchair when he called the HSU, and in any event, he was not responsible for taking away his access to a wheelchair. In fairness, Sheppard's version of their interactions suggest that Bliss may have had an ax to grind with Sheppard, and Bliss acted with ill-will towards Sheppard when he called the HSU. Indeed, Sheppard maintains Bliss was well-aware that he had problems with the plastic chairs in his cell because: he had told Bliss that he had broken chairs in the past; and Bliss saw one of the chairs after Sheppard broke it. Sheppard also attests that he told Bliss about his restriction allowing him to keep a wheelchair in his cell for that very reason. Finally, Sheppard attests that Bliss angrily said he would make sure the wheelchair was taken away.

Even assuming Bliss meant to do Sheppard harm, however, he cannot be held liable for violating Sheppard's Eighth Amendment rights. "For a defendant to be liable under section 1983, [he or she] must be personally responsible for the alleged deprivation of the plaintiff's constitutional rights." *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). Here, all Bliss did was call the HSU on April 29 and asked why Sheppard had been issued a wheelchair, when he was obviously capable of moving around the unit and beyond without using it.

Although Sheppard maintains that Bliss should have known that the wheelchair had been approved for his use in his cell, the decision to take away his wheelchair was not made for almost another month, and the people who made that decision were aware not only of Dr. Gavin's reason for the restriction, but also that Sheppard had broken other plastic chairs in his cell. Moreover, what Bliss reported was true, and he merely relayed that Sheppard appeared to be using the wheelchair beyond the scope of the restriction. Bliss did not take away the wheelchair or any other assistive device; nor did Bliss lie to HSU staff about what he observed. Accordingly, Bliss cannot be held responsible for an independent decision that Adams and Gunderson made a month later after he reported seeing Sheppard moving around without the wheelchair, and he is entitled to summary judgment.

### B. Adams and Gunderson

Adams and Gunderson seek summary judgment because they merely exercised medical judgment in substituting a walker for Sheppard's wheelchair. In response, Sheppard argues that he disagreed with them during their meeting to discuss his use of the wheelchair, and he insisted that he needed a wheelchair to sit safely in his cell. However, even Sheppard's version of that interaction does not support a finding of *deliberate indifference* by either Adams or Gunderson.

Sheppard maintains that he debated with Adams and Gunderson whether he needed a wheelchair, reiterating that Dr. Gavin had approved it for sitting in his cell, and further told them that the plastic chairs typically in his cell broke multiple times because of his weight. However, he does not dispute that Adams and Gunderson explained why

8

his use of the wheelchair was unsafe if he pushed it, because it did not have brakes, and Sheppard does not dispute using the wheelchair for this purpose. Regardless, Sheppard concedes that Adams and Gunderson did not simply confiscate his wheelchair; rather, they provided Sheppard alternatives that should have addressed his need for a safe sitting place in his cell. Indeed, Gunderson located a plastic chair that could support 700 pounds of weight, and Adams and Gunderson immediately replaced the wheelchair with a wheeled walker that included a seat he could use to get around **and** sit if necessary.

No record evidence suggests that defendants Adams or Gunderson had any reason to believe that the walker with a seat would not meet Sheppard's medical needs, that Sheppard would not receive the seat with a greater weight limit, or that Sheppard might break the plastic chair in his cell on May 30. On the contrary, even while he was waiting for a reinforced chair, they also took steps to ensure that Sheppard had access to another assistive device that he could use for sitting. Although Sheppard did not receive that chair before his May 30 fall, Gunderson's understanding was that Sheppard would receive the chair; no evidence suggests that she had reason to believe that Sheppard would not receive a new chair, or that it would be inadequate; or that the walker with a seat would not be sufficient in the interim. Accordingly, no reasonable fact-finder could infer that Adams or Gunderson consciously disregarded his need for a safe place to sit, and they, too, are entitled to summary judgment.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment (dkt. #33) is GRANTED.

2. The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 15th day of March, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge